## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JEFFREY JENNINGS,

    *Plaintiff*,

  v.

WHITEFORD, TAYLOR & PRESTON LLP, *et al.*,

    *Defendants*

Case No. 24-cv-2977-ABA

## MEMORANDUM OPINION

Plaintiff Jeffrey Jennings, the founder of Vetro Building Envelope, LLC, a construction company ("Vetro"), and his co-members of Vetro, Defendants Arthur Burkindine and Donald Taylor, III, sold the company in 2024 to Roschmann Holding GmbH ("Roschmann"), a German company. Mr. Jennings was entitled to approximately $4 million from the proceeds of the sale. The transaction closed, and Mr. Burkindine and Mr. Taylor received their shares of the purchase price, totaling approximately $6.2 million. But Mr. Jennings never received his—not because the buyer failed to pay, but because hackers had gained access to Vetro's computer systems, posed as Mr. Taylor, and induced Roschmann to send Mr. Jennings' share of the proceeds to the hackers. In separate litigation, Vetro is seeking to identify the fraudsters and recover the funds. In this case, Mr. Jennings has sued Mr. Burkindine and Mr. Taylor, contending they are partly responsible for the loss because, among other things, they used an email system to conduct the transaction that had, just months before, been hacked. He also has sued the law firm Whiteford, Taylor & Preston LLP ("Whiteford"), contending they acted

negligently in handling the wire transfer information and negotiating the transaction documents.

For the reasons set forth herein, Plaintiff has alleged sufficient facts to state claims against Whiteford. He also has pled sufficient facts to state a gross negligence claim against Mr. Burkindine and Mr. Taylor, but his other claims against those defendants (for negligence, for breach of contract regarding tax liabilities, and for punitive damages) will be dismissed.

## I.    BACKGROUND[1]

Plaintiff Jennings has alleged the following facts, which the Court "must accept as true" at the pleadings stage, drawing "all reasonable inferences in favor" of Plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

In 2014, Mr. Jennings founded Vetro Building Envelope, LLC, a construction company that designs, fabricates and installs exterior architectural components for mid- to high-rise commercial and residential buildings. ECF No. 1 (Complaint) ¶ 1. He oversaw the company's operations until late 2021, at which point he transferred substantial ownership of the company to Mr. Burkendine and Mr. Taylor. *Id.* ¶ 2. The parties effectuated that transaction in part through a Third Amended and Restated Operating Agreement, which divided the Class A Members Voting Interest as 98% to Mr. Jennings, 1% to Mr. Burkindine, and 1% to Donald Taylor, and divided the Class B Members Economic Interest as 49% to Mr. Burkindine, 26% to Mr. Jennings, and 25% to Mr. Taylor. *Id.* ¶ 47. Plaintiff alleges that, "as consideration for this transfer of

---

[1] At the pleadings stage, the Court "must accept as true all of the factual allegations contained in the [counterclaim] and draw all reasonable inferences in favor of the [non-movant]." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

interest, Mr. Burkindine and Mr. Taylor would pay any tax liabilities relating to the company attributed to Mr. Jennings, and that Vetro Building would maintain a consultancy agreement with Mr. Jennings that paid Mr. Jennings $300,000 per year." *Id.* ¶ 48.

In 2024, Mr. Burkindine and Mr. Taylor informed Mr. Jennings that they wanted to explore a possible sale of the company. *Id.* ¶ 49. They proceeded to negotiate terms for a potential sale of Vetro Building with Roschmann and certain of its affiliates. *Id.* ¶ 50. Mr. Burkindine was appointed as the agent of the owners of Vetro Building for purposes related to the sale. *Id.* ¶ 9. Vetro engaged Whiteford to represent it, and its members, in connection with the sale. *Id.* ¶ 52. Mr. Jennings agreed to be represented by Whiteford together with the other Vetro members. *Id.* ¶ 53. After all, Whiteford "not only had handled other legal matters for Vetro Building, but also was Mr. Jennings' personal counsel and had handled, and was then currently handling, other matters for him." *Id.* Mr. Jennings contends he otherwise had no involvement in Vetro Building's negotiations with Roschmann. *Id.* ¶ 51.

As is typical, the structure of the potential transaction evolved over the course of the negotiations. At some point, Mr. Burkindine and Mr. Taylor informed Mr. Jennings that Roschmann would pay $6 million for the purchase of Mr. Jennings' interest in Vetro. *Id.* ¶ 54. Later, they informed him that the deal would not involve a single upfront payment from Roschmann, but instead payments over time. *Id.* ¶ 55. In response, Mr. Jennings informed Mr. Burkindine and Mr. Taylor that he would agree to a sale only if his interest in Vetro Building was purchased in its entirety at closing. *Id.* Accordingly, they renegotiated the terms and then informed him that the new deal would involve Mr.

Jennings receiving $4 million at closing for the purchase of his equity interest in Vetro, along with termination of his consultancy with Vetro. *Id.* ¶¶ 56–57.

The parties agreed to close the transaction in July 2024. *Id.* ¶ 58. Mr. Jennings signed the transaction documents on or about July 20. *Id.* ¶ 67. He contends he was not provided copies of the purchase agreement or related documents, just the signature pages. *Id.* ¶¶ 10, 64–65.

To effectuate the transfer of funds from Roschmann to Vetro and its members, the parties needed to exchange wire transfer information. On July 16, 2024, Mr. Taylor sent an email to the Whiteford team that contained wiring instructions for each of the three members: Mr. Burkindine, Mr. Taylor, and Mr. Jennings. *Id.* ¶ 59. Mr. Taylor sent the email from his work email (ending in vetrobe.com), and the email contained Mr. Jennings' correct account information for his bank account at Wells Fargo. *Id.* On July 18, Mr. Taylor informed Mr. Jennings that additional wiring information (specifically IBAN and Swift) numbers might be needed; Mr. Jennings provided that information to Mr. Taylor, which Mr. Taylor provided to the Roschmann contact for the transaction, Marie-Jeanne Hauser. *Id.* ¶¶ 60, 62.

Meanwhile, fraudsters were lurking in Vetro's electronic systems. In January and February 2024, Vetro had been the subject of a hacking intrusion that resulted in Vetro paying more than $2 million on fake invoices. *Id.* ¶ 122. Vetro Building has acknowledged that this hacking occurred "[u]sing a technique referred to as 'email spoofing' or 'email impersonation.'" *Vetro Bldg. Envelope LLC v. Doe 1-100*, No. 24-cv-02556 (D. Md. Sept. 3, 2024) ("*Does* Compl."), ¶ 16. No one at Vetro had told Mr. Jennings about the intrusion at the time. ECF No. 1 ¶ 123. At the time of the hack, Vetro's IT provider advised Vetro to "obtain Barracuda email security service to prevent

4

future attacks." *Id.* ¶ 126. Mr. Jennings contends the company "did not take this precaution," *id.* ¶ 126, though Vetro disputes this. ECF No. 13-9. In any event, Mr. Jennings contends that Mr. Burkindine and Mr. Taylor affirmatively withheld from Mr. Jennings information about the hacking incidents or the fact that because of the email spoofing scam Vetro had been fraudulently induced to pay $2 million in fake invoices. ECF No. 1 ¶ 129. He alleges that Mr. Burkindine and Mr. Taylor told him that they never informed him of the prior hack because they were worried that, in response, he would try to pull back the equity he transferred to them in 2022. *Id.* ¶ 124.

It turned out the fraudsters had maintained access to Vetro's systems after the January 2024 intrusion. And when Mr. Taylor was emailing with Whiteford and Roschmann regarding the transaction—including sending the wire transfer information—he was using the same email system that had been hacked earlier that year. *Id.* ¶ 193. As set forth in an email on August 1, 2024, from one of the attorneys at Whiteford, after Mr. Taylor sent his email to Whiteford with Mr. Jennings' correct wire transfer information, someone else (one of the fraudsters) impersonated Mr. Taylor and induced Roschmann to send the funds meant for Mr. Jennings to a different account instead. *Id.* ¶ 23.

The specific chronology was as follows: On July 19, 2024, at 11:15 a.m., Mr. Taylor had sent the email to Roschmann containing the correct wire transfer information, including the information for Mr. Jennings' account at Wells Fargo. *Id.* ¶¶ 91–92. Ms. Hauser at Roschmann confirmed receipt at 11:47 a.m. *Id.* ¶ 93. At 11:52 a.m., a second email was sent by a person purporting to be Mr. Taylor stating, "For clarification, Jeffrey's funds should be transferred to his trust account for his benefit which has been revised below." *Id.* ¶ 94. That (fraudulent) email was sent to Ms. Hauser

and copied Whiteford attorneys D. Shane Smith and Jay Keeton, Roschman's attorney, and contained wiring information for a Citibank account under the name Global Trust Depository. *Id.* This was followed shortly thereafter by another email from Mr. Taylor's account at 12:16 p.m. on July 19 offering to "resend wire instructions in one email for reference and clarity" to the same recipients. *Id.* ¶ 95.[2] Ms. Hauser responded at 12:35 p.m., "Maybe final instruction would be the best to be sure that no mistake [sic] happen" with an emoji smiley face. *Id.* In response, a message was sent from Mr. Taylor's vetrobe.com email responding to all prior recipients, which included wiring instructions for Mr. Taylor, Mr. Burkindine, and, purportedly, for Mr. Jennings. *Id.* ¶ 96. That message, however, again directed Roschmann to send Mr. Jennings' portion of the proceeds to the Global Trust Depository Citibank account, not his Wells Fargo account. *Id.*

"Despite the conflicting wiring instructions sent for Mr. Jennings in the July 19, 2024 email exchanges, no one involved in the transaction reached out to him to confirm which of the instructions was correct," *id.* ¶ 98, or otherwise obtain "voice confirmation from Mr. Jennings for the wire transfer." *Id.* ¶ 99. He also notes that Whiteford "already possessed" his (accurate) account information in its capacity as his personal attorneys but did not catch the discrepancy. *Id.* ¶ 100. As Mr. Jennings puts it in the complaint, "Despite receiving multiple emails containing conflicting information relating to Mr. Jennings account—including an initial instruction identifying the Wells Fargo account Whiteford knew to be Mr. Jennings' actual account, but subsequent instructions

---

[2] Paragraph 95 of the complaint lists the timestamp for that email as "12:16 a.m. on July 19" but in context the reference to "a.m." appears to be a typographical error.

directing funds to an unknown Citibank account held by Global Trust Depository—no one from Whiteford sought confirmation or clarification from Mr. Jennings—their long-standing client—which account was correct." *Id.* ¶ 102. Mr. Jennings also notes that the Equity Purchase Agreement that Whiteford negotiated and reviewed for the sellers did not provide for an escrow or other mechanism; he contends that if such a mechanism had been in place, it would have "prevented the transfer of Mr. Jennings' equity until such time that Mr. Jennings was in actual receipt of payment." *Id.* ¶ 111.

Through later investigation, Mr. Jennings learned Global Trust Depository had been engaged by a Hong Kong company called Waitech AG Group ("Waitech") to act as a "paymaster." *Id.* ¶ 117. Waitech allegedly asserted to Global Trust Depository that it was engaging in a transaction with Roschmann United in which Roschmann would wire $3.795 million to Global Trust Depository to pay for the purchase of cryptocurrency that Roschmann would receive from Waitech. *Id.* ¶ 118. Global Trust Depository subsequently wired approximately $2.79 million to the IOLTA account of an attorney in Arizona and approximately $1 million to the IOLTA account of an attorney in Nevada. *Id.* ¶ 119. The $2.79 million sent by Global Trust Depository to the Arizona attorney's IOLTA account was sent to two cryptocurrency exchanges—Payward Interactive, Inc., which does business as "Kraken," and "Gemini Trust Company LLC," which does business as "Gemini," to purchase cryptocurrency. *Id.* ¶ 120.

On July 22, Ms. Hauser emailed Mr. Taylor to confirm that the "first tranche closing payment" had been "released." *Id.* ¶ 97. The payments that were due to Mr. Burkindine and Mr. Taylor, totaling approximately $6.21 million, were successfully transmitted to them. *Id.* ¶ 114. But Mr. Jennings "never received the money owed under

the Equity Purchase Agreement for the purchase of his equity interest in Vetro Building." *Id.* ¶ 115.

After learning that the funds that had been intended for him had been redirected to the wrong account, Mr. Jennings "asked Whiteford what they were doing with respect to the funds." *Id.* ¶ 108. The Whiteford attorney informed him that the banks had been "immediately notified" and that "a hold was placed on the Citi Bank account"—though Citibank did permit Global Trust Depository to distribute the $3.795 million in funds it had received from Roschmann—and that "the police, Interpol, and the FBI have been contacted." *Id.* ¶¶ 109, 116. Whiteford did not (at least at that time) contact Global Trust Depository to inquire about the diverted funds. *Id.* ¶ 110.

Mr. Jennings filed this lawsuit in October 2024, against Whiteford, Mr. Burkindine and Mr. Taylor. ECF No. 1. He asserts three claims against Whiteford. In Count 1, he alleges that Whiteford was negligent with respect to the fund transfers when it "failed to alert Mr. Jennings or to otherwise take steps to protect him after receiving suspicious and conflicting instructions about where to wire Mr. Jennings' money." *Id.* ¶ 157. In Count 2, he alleges that Whiteford was negligent in its representation of him in negotiating and documenting the sale transaction itself, including by allegedly failing to advise him of material terms, or the risks of transferring interests in the company before receiving payment, as well as other terms in the Equity Purchase Agreement. *Id.* ¶¶ 165–66, 168. He alleges damages in connection with Counts 1 and 2 of at least $4 million. *Id.* ¶¶ 161, 169. In Count 3, Mr. Jennings alleges that Whiteford also violated its duty to produce its client file upon request. *Id.* ¶¶ 172, 173.

Mr. Jennings asserts two claims against Mr. Burkindine and Mr. Taylor. Count 4 is a negligence claim, alleging that Mr. Burkindine and Mr. Taylor were negligent in

failing to prevent the hacking incursions in early 2024, and then in allowing the hack to continue while withholding the information from him, and then in allowing the hackers to induce Roschmann to send Mr. Jennings' portion of the transaction proceeds to the hackers. *Id.* ¶¶ 188–200. He seeks damages of at least $4 million on Count 4. In Count 5, Mr. Jennings alleges that Mr. Burkindine and Mr. Taylor breached the alleged agreement that they would pay any tax liability of Mr. Jennings relating to Vetro. *Id.* ¶ 203. He alleges that the amount of such tax liability as of October 2024 was $600,000 plus interest and penalties. *Id.* ¶ 204.

Defendants have moved to dismiss the complaint. Whiteford argues that Count 1 should be dismissed because Plaintiff does not adequately allege a breach of the standard of care, or causation, that Count 2 does not adequately allege causation or cognizable damages, and that Count 3 does not state a client-file-related legal malpractice claim. ECF No. 12-1 at 7–20.[3] Mr. Burkindine and Mr. Taylor argue Count 4 should be dismissed for failure to allege that they owed a duty to Mr. Jennings, and because of the economic loss doctrine, that Count 5 does not state a claim for breach of contract, and that the complaint does not adequately allege a claim for punitive damages. ECF No. 13-1 at 10–20. They also seek summary judgment on both counts. *Id.* at 15–16. Plaintiff has responded to both motions to dismiss. ECF Nos. 17 & 18. Defendants filed reply briefs. ECF Nos. 22 & 23.

## II.    STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even

---

[3] Page citations are to the ECF page numbers, which may differ from the pagination used by the parties.

assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The pleadings must contain sufficient factual allegations to state a facially plausible claim for relief. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As noted above, when considering such a motion, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212.

## III.    CLAIMS AGAINST WHITEFORD

Counts 1 through 3 allege that Whiteford committed legal malpractice in connection with the wire transfer information (count 1), advising Mr. Jennings about the transaction (count 2), and refusing to share its "client file" with Mr. Jennings (count 3). Whiteford has moved to dismiss each of those counts. ECF No. 12. Plaintiff's brief in response to Whiteford's motion is ECF No. 17, and Whiteford's reply brief is ECF No. 22.

### A.    Count 1 – Legal malpractice regarding wiring instructions

Whiteford argues Count 1 fails to state a claim on which relief can be granted for two reasons.

First, Whiteford argues that the complaint does not allege with sufficient detail that Whiteford breached a duty of care that it owed to Mr. Jennings as its client. To prevail on a claim for attorney negligence under Maryland law, a plaintiff must prove "(1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3)

10

loss to the client proximately caused by that neglect of duty." *E.g.*, *Suder v. Whiteford, Taylor & Preston, LLP*, 413 Md. 230, 239 (2010). Whiteford argues that the complaint does not sufficiently allege that it had a "duty" to prevent Mr. Jennings' portion of the proceeds from the transaction from being misdirected. Whiteford summarizes its arguments this way:

> Count I is based exclusively on Whiteford's alleged failure to identify and prevent a wire fraud scam perpetrated by an unknown third party. Plaintiff essentially asks the Court to accept the legal conclusion that Whiteford, solely by virtue of being Vetro Building's attorney, should have intervened before Roschmann wired funds to an unknown actor (Compl. ¶¶ 121-125). However, Plaintiff does not allege that Whiteford had any contractual or fiduciary obligation to perform these tasks or that Whiteford agreed to do so. . . . Rather, Roschmann was responsible for wiring the funds, and Mr. Taylor sent the instructions to the involved parties.

ECF No. 12-1 at 10–11; *see also* ECF No. 22 at 7 (arguing that Whiteford's "representation of Plaintiff in negotiating and reaching agreement as to the Equity Purchase Agreement did not require Whiteford to thereafter police the parties' subsequent conduct in arranging for the direct payment from the buyer (Roschmann) to the sellers (Plaintiff, along with Messrs. Taylor and Burkindine) to investigate whether the parties were providing accurate information regarding the logistics of the payments to be made.").

At the pleadings stage, Mr. Jennings must allege facts that, if true, are sufficient to give rise to a duty by Whiteford that, if discharged, would have prevented the hackers from diverting the funds that were supposed to go to Mr. Jennings. The complaint adequately does so. It alleges, among other things, that Whiteford represented not just Vetro but each of its members, including Mr. Jennings, ECF No. 1 ¶ 52; in the days

11

before the closing, Whiteford received Mr. Jennings' Wells Fargo account and other banking information, and Mr. Jennings confirmed to his counsel that the funds should be sent to the Wells Fargo account, *id.* ¶¶ 59, 60, 63; and that within 5 minutes on July 19, 2024, the Whiteford attorneys received separate emails with conflicting wiring information for Mr. Jennings but did not circle back to Mr. Jennings to confirm where the funds should go or otherwise investigate the issue or intervene to prevent the funds from being misdirected, *id.* ¶¶ 91–94.

The allegations in the complaint, and with reasonable inferences drawn in Plaintiff's favor, sufficiently allege that, in the context of a longstanding prior client relationship, a reasonable attorney would have investigated and alerted the client about a last-minute change to wiring instructions, particularly when that change entailed a redirection of a client's anticipated proceeds from a transaction. *See id.* ¶ 158. These are not "conclusory" allegations as Whiteford contends. *See* ECF No. 22 at 8. Instead, these alleged facts, in the context of Mr. Jennings' other allegations in the complaint, sufficiently allege that Whiteford failed to represent Mr. Jennings in connection with the transaction with reasonable skill, care, and diligence, and that Whiteford's conduct fell below the standard of care expected of attorneys representing clients in an equity sale. ECF No. 1 ¶¶ 153–57.

Second, Whiteford argues that the complaint does not adequately allege that any breach of the applicable standard of care was the "proximate cause of Plaintiff's failure to receive the misdirected wire payment." ECF No. 12-1 at 12. An attorney malpractice claim is a type of negligence claim. For Plaintiff to make out a malpractice claim, he "must demonstrate a loss proximately caused by neglect of a duty owed." *Catler v. Arent Fox, LLP*, 212 Md. App. 685, 731 (2013) (cleaned up). "To be a proximate cause for an

injury, the negligence must be 1) a cause in fact, and 2) a legally cognizable cause." *Id.* at 732 (quoting *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009)). This requires "a certain relationship between the defendant's conduct and the plaintiff's injuries." *Id.* The "first step in the analysis to define that relationship is an examination of causation-in-fact to determine who or what caused an action," and the "second step is a legal analysis to determine who should pay for the harmful consequences of such an action." *Id.*

On the "causation-in-fact" component of the analysis, "[t]wo tests have developed." *Pittway*, 409 Md. at 244. "The 'but for' test applies in cases where only one negligent act is at issue; cause-in-fact is found when the injury would not have occurred absent or 'but for' the defendant's negligent act." *Id.* (citations omitted). "When two or more independent negligent acts bring about an injury, however, the substantial factor test controls," meaning "[c]ausation-in-fact may be found if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id.* (citations omitted). With regard to legal causation, "foreseeability of harm and manner of occurrence are the primary indicia of legal cause." *Board of County Comm'rs v. Bell Atlantic-Maryland,* 346 Md. 160, 184 (1997).

In his complaint, Plaintiff does not dispute that an unknown third party hacked into the Vetro email account(s), and that the criminal conduct was the immediate cause for the diversion of the millions of dollars to which Plaintiff was entitled. Whiteford argues that *because* Mr. Jennings was the victim of wire fraud, and because Roschmann "wired the funds without verifying the instructions or using voice confirmation, despite receiving conflicting information from Mr. Taylor's account," Mr. Jennings cannot plausibly plead that Whiteford's failures to prevent the fraud were a proximate cause for

the loss. ECF No. 12-1 at 12. In other words, Whiteford argues, "while Plaintiff may have claims against either the fraudulent actor who misdirected the payment, or potentially the purchaser who failed to deliver the funds to Plaintiff, Plaintiff has not pled any facts to show that Whiteford's conduct was a cause in fact or a legally cognizable cause of his loss." *Id.* at 13 (citing *Hall v. Sullivan*, 272 F. App'x 284, 288 (4th Cir. 2008)).

Whiteford's causation argument fails, at least at the pleadings stage. "Although a third-party's criminal act often constitutes an unforeseeable superseding cause," under Maryland law, "[i]n the context of a third-party's criminal act, proximate cause may be established when an actor's 'negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime' *and* 'the actor at the time of his negligent conduct *realized or should have realized the likelihood that such a situation might be created*, and that a third person *might avail himself of the opportunity to commit such a tort or crime*.'" *Mitchell v. Rite Aid of Md., Inc.*, 257 Md. App. 273, 320, 330–31 (2023) (quoting Restatement (Second) of Torts § 448 (1965) ("Second Restatement")). In other words, when negligent conduct "increases the foreseeable risk of harm through the intervention of [a third party], and is a substantial factor in causing the harm, such intervention is not a superseding cause." Restatement (Second) § 442A; *see also Browne v. State Farm Mut. Auto. Ins. Co.*, 258 Md. App. 452, 485 (2023) ("An intervening act is generally considered a superseding cause when it is an 'unusual' or 'extraordinary' act 'that could not have been anticipated by the original tortfeasors.'") (quoting *Copsey v. Park*, 453 Md. 141, 165 (2017)).

Here, Plaintiff expressly alleges that Whiteford's failure to investigate the suspicious and conflicting wiring information or contact Mr. Jennings increased the foreseeable risk of wire fraud and allowed the theft to occur. ECF No. 1 ¶¶ 155–61. As the

Maryland Supreme Court has put it, unless "reasoning minds cannot differ," it is generally "improper to determine—on a motion to dismiss—whether intervening . . . acts or omissions were highly extraordinary and, hence, superseding causes" of the harm alleged. *Pittway*, 409 Md. at 253. Plaintiff has adequately alleged that Whiteford's alleged negligence in handling the wire transfer information was a "substantial factor" in the chain of events that resulted in the fraudsters making off with Plaintiff's funds. *See* Restatement (Second) § 442A.

For these reasons, Whiteford's motion to dismiss Count 1 will be denied.

## B.    Count 2 – Legal malpractice regarding equity purchase agreement

In Count 2, Plaintiff alleges that Whiteford was negligent in its representation of him in negotiating and preparing the Equity Purchase Agreement. Plaintiff alleges that Whiteford, for example, "[f]ailed to advise Mr. Jennings regarding the risks of transferring his interest in the company before he had received payment, including the risk that he might never receive payment," or ways that such risk "could be mitigated," and also failed to "advise Mr. Jennings regarding the existence and effect" of certain provisions including a release, restrictive covenant, jury trial waiver, and forum selection. ECF No. 1 ¶ 168(a)-(c), (e)-(f). He also alleges that Whiteford "[p]rioritized the interest of co-clients above those of Mr. Jennings." *Id.* ¶ 168(d). As Plaintiff summarizes in his brief, he alleges that "[i]f Whiteford had done its job to the standard expected of a reasonable attorney, the contract would have contained an escrow provision—which is standard in this sort of purchase agreement—that would have prevented exactly what happened here," by "prevent[ing] Mr. Jennings from assigning his equity interest until payment had been received from the buyer." ECF No. 17 at 16.

15

Whiteford has moved to dismiss Count 2, in whole or in part, for three reasons.

First, Whiteford argues that even if it was negligent in those ways, such negligence was not the proximate cause of Plaintiff's loss of the proceeds from the Vetro sale because Plaintiff "fails . . . to explain *how* such alleged failures were the direct and 'but for' cause of his injuries." ECF No. 21-1 at 15. Whiteford argues that Plaintiff does not plausibly allege that "had Whiteford fully advised him of the risks of executing the Equity Purchase Agreement as drafted, or the consequences to Plaintiff resulting from the restrictive covenants contained therein, he would *not* have elected to execute the Equity Purchase Agreement." *Id.* at 14-15. Moreover, Whiteford contends, "the cyber security breach within Vetro Building was a completely independent, and unforeseeable (from Whiteford's perspective) intervening act." *Id.* at 18. Accordingly, Whiteford contends the complaint does not satisfactorily allege proximate causation. *Id.* at 15-17 (citing *Kelly v. Offit Kurman, P.A.*, Case No. 17-cv-3668-CCB, 2021 WL 3725379, at *17 (D. Md. Aug. 23, 2021), *aff'd,* Case No. 21-2178, 2023 WL 2570968 (4th Cir. Mar. 20, 2023); *Royal Ins. Co. v. Miles & Stockbridge, P.C.,* 133 F. Supp. 2d 747, 757-758 (D. Md. 2001)).

As noted above, to "succeed on [his] malpractice claims," Plaintiff must "demonstrate a loss proximately caused by neglect of a duty owed." *Catler*, 212 Md. App. at 731 (cleaned up). "To be a proximate cause for an injury, the negligence must be 1) a cause in fact, and 2) a legally cognizable cause." *Id.* at 732. Here, taking Plaintiff's allegations as true and drawing all reasonable inferences in Plaintiff's favor, the complaint adequately alleges that Whiteford's alleged negligence was a substantial factor of the loss. Plaintiff alleges that Whiteford was negligent in failing to advise him that he should have, for example, insisted that the Equity Purchase Agreement contain

an escrow or other contractual provision that would have "protected Mr. Jennings from losing his valuable interest in Vetro Building absent actual receipt of payment." ECF No. 1 ¶ 168(a). Similarly, he alleges that Whiteford should have advised him to negotiate that the release be structured differently, to avoid a situation where he was left without any proceeds from the sale but having released certain claims against other participants in the transaction. *Id.* ¶ 168(b). It is irrelevant that, as Whiteford contends, "it was Whiteford's negotiation of the Equity Purchase Agreement that *entitled* Plaintiff to $4 million in the first instance." ECF No. 21-1 at 17. And there appears to be no dispute that the "cyber incident," as Whiteford puts it, was the immediate cause of the loss. *Id.* Plaintiff alleges that Whiteford's negligence made it more likely that he would find himself the victim of a fraud like this one, and more likely that, if the victim of such fraud, that he would be left without remedies, or with fewer remedies, than in the absence of such negligence. That is sufficient at the pleadings stage with respect to causation. And to the extent Whiteford also frames its causation argument on Count 2 as one of an unforeseeable superseding act, as explained above a motion to dismiss is not generally the appropriate juncture for the resolution of that question. *See Pittway*, 409 Md. at 253.

Second, Whiteford argues that, regardless of causation, Plaintiff has not alleged any "cognizable damages." ECF No. 12-1 at 18. Whiteford concedes that Mr. Jennings alleges that he has not been paid the $4 million that he was due from the sale of Vetro. *Id.* But it argues that "the alleged conduct which forms the basis of Count II . . . did not result in this loss." *Id.* at 19. But this is just a slightly reworded version of Whiteford's causation argument, and thus it fails for the same reasons as those set forth above.

Third, Whiteford argues, "Plaintiff's one-sentence suggestion that he may incur 'potential ongoing damages' arising from his restrictive covenants in the Equity Purchase Agreement is insufficient to demonstrate a basis to award damages." ECF No. 12-1 at 19. The argument seems to be that even if Count 2 states a claim on which relief can be granted, the Court should strike the portion of Count 2 that seeks to recover for "potential ongoing damages relating to restrictions placed on his future investments and employment." ECF No. 1 ¶ 169 (complaint); ECF No. 12-1 at 19 (motion). Plaintiff does not respond to this argument in his brief in opposition to the motion to dismiss. And where a party has failed to respond to an argument in a motion, that issue is generally considered to have been conceded. *See, e.g., Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to 'develop its argument.'") (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015)) (cleaned up); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to this argument, the plaintiff abandons any discriminatory discharge claim."). But in the context of Whiteford's motion, the argument seems to have been premised on the preceding argument, regarding the fraud constituting a superseding act, *i.e.*, that assuming the fraud constituted a superseding act requiring dismissal of Plaintiff's claim based on the $4 million, Count 2 is not salvaged by the allegation regarding "ongoing damages" related to the restrictive covenants. ECF No. 21-1 at 18–19. Thus, the Court will not deem Plaintiff to have conceded that issue, and will instead permit that tagalong component of Count 2 to proceed to discovery.

For these reasons, Whiteford's motion to dismiss Count 2 will be denied.

### C.    Count 3 – Client file

In Count 3, Plaintiff alleges that, in August 2024, he "requested from Whiteford a copy of the legal file relating to the sale of Vetro Building" but Whiteford "failed to provide his client file as requested." ECF No. 1 ¶¶ 173–75. Whiteford sent him "final closing documents for the Equity Purchase Agreement, a PDF of Attorney Smith's email to Mr. Jennings (which Mr. Jennings had already received previously), and PDFs of printouts of the emails containing the wiring instructions that were given for Mr. Jennings (which Mr. Jennings had already received from Attorney Smith)." *Id.* ¶ 177. But he contends this was not the "*complete* client file," *id.* ¶ 181, which he seems to contend Whiteford conceded by stating that producing the complete file would be "too burdensome." *Id.* ¶ 176.

Whiteford argues Count 3 should be dismissed for two reasons.

First, Whiteford argues that it has not violated Maryland Rule 1.16 because that rule applies only "[u]pon termination of representation." ECF No. 21-1 at 20 (quoting Md. Rule 19-301.16(d)). But it abandons this argument in its reply brief. ECF No. 22 at 12–15.

Second, Whiteford argues that even if it has violated its duties under Maryland Attorneys' Rule of Professional Conduct 16(d) and/or Virginia Rule of Professional Conduct 1.15(d), such "violation . . . does not give rise to a private cause of action against an attorney or create a presumption that the attorney has breached a legal duty." ECF No. 21-1 at 20. But Count 3 does not claim a cause of action based on the Maryland and Virginia Rules of Professional Conduct themselves. Instead, the cause of action alleged in count 3 is negligence, like in Counts 1 and 2. ECF No. 1 at 27 (Count 3 titled "LEGAL MALPRACTICE—CLIENT FILE"). And although Whiteford argues that "failing to

return the entirety of a client's file" does not "constitute[] a breach of an attorney's duty of care," ECF No. 22 at 14, Plaintiff does contend that, at least in the context of this case, Whiteford's refusal to turn over the entire "client file" constituted a breach of the duties of care and loyalty that the firm owed to him as one of its clients. ECF No. 17 at 21 ("Whiteford, like every lawyer representing a client, owed Mr. Jennings a duty of loyalty, a duty to act in his best interest, and a duty to protect and safeguard his property. . . . In failing to promptly return the client file, especially in the context of an ongoing dispute where Whiteford's *own conduct* is at issue, Whiteford failed to act with due care, and instead has put its own best interests ahead of its former client."). At least for pleading purposes, those allegations are sufficient to state a legal malpractice claim related to Whiteford's alleged withholding of portions of the client file.[4]

For these reasons, Whiteford's motion to dismiss Count 3 will be denied as well.

## IV.    CLAIMS AGAINST BURKINDINE AND TAYLOR

Counts 4 and 5 allege that Defendants Burkindine and Taylor are liable to Mr. Jennings for negligence because of their allege failure to secure Vetro's system from hackers (count 4), and their breach of the alleged oral contract to "pay any tax liability of Mr. Jennings[] relating to the company," ECF No. 1 ¶ 203 (count 5). Defendants Burkindine and Taylor have moved to dismiss each of those counts.

---

[4] The motion to dismiss does not require the Court to consider what categories of documents comprise the client file beyond those that Whiteford produced. By denying the motion to dismiss Count 3, the Court does not decide that question. Also, it is not clear at this stage whether Count 3 would be cognizable standing alone, in the absence of Counts 1 and 2; the Court need not decide that issue, because those counts are proceeding to discovery, for the reasons discussed above.

## A.    Count 4 – Negligence and Gross Negligence

Mr. Burkindine and Mr. Taylor contend that Count 4 fails to state a claim on which relief can be granted for two reasons.[5]

First, they argue Plaintiff has not alleged that Mr. Burkindine and Mr. Taylor owed a duty to Mr. Jennings "to ensure the security of [Vetro's] computer systems and safeguard its computers and information technology systems against external hacking." ECF No. 13-1 at 12. If they owed any duty to safeguard Vetro's computer systems, such a duty was "owed to Building, not to Jennings." *Id.*

Mr. Jennings raises a number of arguments in response. One is that in the Vetro operating agreement, Mr. Burkindine and Mr. Taylor expressly agreed that they owed Mr. Jennings *some* duties for a "loss incurred by the Company or a[] Member with respect to the Company." The Court agrees. Section 12.2 of the operating agreement provides as follows:

> None of the Members, members of the Board of Directors, or any Officer of the Company will be liable to the Company or any Member for any loss incurred by the Company or any Member with respect to the Company, for any reason other than
>
> (i)    to the extent that the loss is attributable to
>
> (x)    **gross negligence or fraud**,

---

[5] In addition to these arguments for dismissal, Mr. Burkindine and Mr. Taylor also contend they should prevail on Count 4 because "[c]ontrary to Plaintiff's allegations, Building followed its IT provider's recommendation" regarding a cybersecurity system. ECF No. 13-1 at 15. But at the pleadings stage this Court must assuming the truth of the alleged facts. *King*, 825 F.3d at 212. Here, as Defendants recognize, Plaintiff alleges, among other things, that these Defendants "failed to install Barracuda—the system recommended by [Vetro's] IT provider." ECF No. 13-1 at 15.

> (y)    unlawful acts or omissions that it, he or she
>         knew or had reason to know at the time that they
>         occurred were **clearly unlawful**, or
>
> (z)    acts or omissions that it, he or she knew or had
>         reasonable cause to know at the time they
>         occurred were **clearly in conflict with the
>         interests of the Company and in violation
>         of this Agreement**; or
>
> (ii)   with respect to transactions or other actions from
>         which the Members, member of the Board of Directors,
>         or the Officer, as the case may be, derived an
>         **improper personal benefit**, to the extent of the
>         improper personal benefit.

ECF No. 13-3 at 28–29 (formatting and bolding added).

On one hand, that limitation-of-liability clause does limit the types of claims that Mr. Jennings may assert against Mr. Burkindine and Mr. Taylor, as discussed below. But on the other hand, it confirms that Mr. Burkindine and Mr. Taylor owed a duty to Mr. Jennings not to, for example, act with "gross negligence" that results in a "loss incurred by . . . [a] Member with respect to the Company." *Id.* at 28. At least at the pleadings stage, that is sufficient to reject Defendants' argument that "Count IV does not allege a duty owed by Messrs. Burkindine and Taylor to Mr. Jennings," ECF No 13-1 at 10. The Court need not decide, for example, whether the relationship between the parties qualified as an "intimate nexus" within the meaning of *Jacques v. First Nat'l Bank*, 307 Md. 527, 534–35 (1986), and its progeny, *see, e.g.*, ECF No. 18 at 8, or a "special relation" within the meaning of cases such as *Corinaldi v. Columbia Courtyard, Inc.*, 162 Md. App. 207, 219 (2005), *see, e.g.*, ECF No. 18 at 10 n.5.

Second, Mr. Burkindine and Mr. Taylor argue that even if they owed Mr. Jennings duties that were acknowledged and preserved in § 12.2, to the extent the

complaint alleges a bare negligence claim—*i.e.*, not a *gross* negligence claim—Count 4 should be dismissed because Mr. Jennings has exculpated them in § 12.2 for such claims. The Court agrees. When members of an LLC set forth in an operating agreement their duties to each other with respect to "[t]he members' relationship with one another, the affairs of the LLC, and the conduct of the LLC's business," those obligations "are governed by contract, defined as an 'operating agreement.'" *Plank v. Cherneski*, 469 Md. 548, 570–71 (2020) (citing Md. Code Ann., Corps. & Ass'ns § 4A-101). Moreover, under Maryland law, "[a]n exculpatory clause is a 'contractual provision relieving a party from liability resulting from a negligent or wrongful act." *BJ's Wholesale Club, Inc. v. Rosen*, 435 Md. 714, 724 (2013) (quoting Black's Law Dictionary (9th ed. 2009)). "To provide a release from liability for claims of negligence, the clause does not need to use that exact word, but its language must 'clearly and specifically indicate[] the intent to release the defendant from liability . . . caused by the defendant's negligence.'" *Okorie v. Resident Rsch., LLC*, 617 F. Supp. 3d 320, 323 (D. Md. 2022) (quoting *Adloo v. H.T. Brown Real Est., Inc.*, 344 Md. 254, 266 (1996)). The standard "is a stringent and exacting one, under which the clause must not simply be unambiguous but also understandable." *Adloo*, 344 Md. at 264.

Here, § 12.2 in the operating agreement clearly and specifically sets forth the parties' agreement that they were exculpating each other from any claims arising from losses incurred by Vetro or any member "with respect to the Company, for any reason other than . . . to the extent that the loss is attributable to" gross negligence, fraud, conduct the party knows or has reason to know is "clearly unlawful" or "clearly in conflict with the interests of the Company and in violation of this Agreement," or with respect to transactions derived from an "improper personal benefit." ECF No. 13-3 at

28–29. That provision clearly and specifically indicates that the parties were waiving their right to assert claims for negligence against each other where the conduct does not rise to the level of gross negligence (or one of the other enumerated carve-outs).

Mr. Jennings argues that, notwithstanding § 12.2, the LLC members were obligated "to protect [each other] against crimes by third parties" because the members had a "special relationship" and because Defendants allegedly had "knowledge of the dangerous situation." ECF No. 18 at 10 & n.5; *see also id.* at 10 (arguing that this "common law dut[y]" was "not considered by the Third Operating Agreement"). In other words, he argues that notwithstanding the express language in § 12.2, that provision does not apply to duties to protect each other "against crimes by third parties." ECF No. 18 at 10. In support of the existence of that duty, he cites *Scott v. Watson*, 278 Md. 160, 169 (1976); *Corinaldi*, 162 Md. App. at 220; *In re Blackbaud, Inc.*, 567 F. Supp. 3d 667, 682 (D.S.C. 2021); and *Valentine v. On Target, Inc.*, 112 Md. App. 679, 687 (1996), *aff'd*, 353 Md. 544 (1999) (citing Restatement (Second) of Torts § 302B (1965)). But among other potential distinguishing factors, none of those cases involved a contractual exculpation or limitation-of-liability clause. Here, § 12.2 clearly and specifically bars claims other than those specified. Insofar as Mr. Jennings has pled a claim for *gross negligence* based on an alleged failure to protect Mr. Jennings from the fraudsters (discussed in the paragraphs immediately below) such a claim is consistent with § 12.2.[6] But Mr. Jennings has not identified authority that would permit the Court to disregard

---

[6] Mr. Jennings does not invoke the "fraud," "clearly unlawful," "clearly in conflict with the interests of the Company" or "improper benefit" prongs. Instead, his theory is that the complaint adequately alleges a claim for gross negligence. ECF No. 18 at 7–14.

the plain language of § 12.2 and conclude that claims other than those specifically carved out in § 12.2 are viable among the Vetro members.

Third, Mr. Burkindine and Mr. Taylor argue that although § 12.2 carves out gross negligence claims, Count 4 should be dismissed because it does not allege facts that, even if true, would state a claim for gross negligence.[7] Under Maryland law, "[g]ross negligence is 'an intentional failure to perform a manifest duty in reckless disregard for the consequences as affecting the life or property of another.'" *Barbre v. Pope*, 402 Md. 157, 187 (2007) (quoting *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635 (1985)). Gross negligence applies "only when [the defendant] inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist." *Stracke v. Estate of Butler*, 465 Md. 407, 421 (2019) (quoting *Barbre*, 402 Md. at 187). While questions about whether a defendant has acted with gross negligence are ordinarily questions of fact, *see Artis v. Cyphers*, 100 Md. App. 633, 652 (1994), to state a gross negligence claim sufficient to survive a motion to dismiss a plaintiff must have pled facts that, if true, would constitute "a wanton or reckless disregard for human life." *State v. Kramer*, 318 Md. 576, 590 (1990). "Only conduct that is of extraordinary or outrageous character will be sufficient to imply this state of mind." *Id.*

---

[7] Defendants title this argument as based on the "economic loss rule," and cite *Jacques*, 307 Md. at 527. ECF No. 13-1 at 12. The issue here is not one invoking the traditional application of the economic loss doctrine, because the parties have not only entered into a written contract but have expressly set forth the scope of their respective tort liability to each other "for any loss incurred by the Company or any Member with respect to the Company." ECF No. 13-3 at 28–29 (§ 12.2). It is the terms of the LLC operating agreement, not the common law economic loss doctrine, that governs whether Count 4 is barred by the exculpation provision in the operating agreement.

Mr. Jennings' argument that his allegations are sufficient to state a claim for gross negligence is as follows:

> Mr. Jennings alleges that Defendants Burkindine and Taylor were aware, before executing the sale to Roschmann, that Vetro Building's IT systems, including their email system, had been breached by hackers multiple times, resulting in $2 million of fraudulently paid invoices. Compl. ¶ 192. Defendants did not take reasonable steps to remove the hackers' access to Vetro Building's computer systems or to protect the systems against additional attacks. *Id*. ¶ 195. Despite failing to ensure the security of Vetro Building's computer systems and despite knowing that the systems had been breached on multiple occasions, Mr. Burkindine and Mr. Taylor used the breached computer systems to communicate with Mr. Jennings, Roschmann (the purchasers), and their counsel. *Id*. ¶ 193. Moreover, they used the breached computer systems to process and transmit Mr. Jennings' personal financial information. Id. ¶ 197. Neither Mr. Burkindine nor Mr. Taylor informed Mr. Jennings of the incidents because they feared that they personally would suffer adverse consequences if Mr. Jennings learned of the breaches. *Id*. ¶ 198. These allegations show that, at a minimum, Defendants Burkindine and Taylor acted with a reckless disregard of Mr. Jennings' rights and property. That is grossly negligent conduct.

ECF No. 18 at 16.

Mr. Burkindine and Mr. Taylor acknowledge that the complaint expressly alleges that they were grossly negligent, but argue that the factual allegations are insufficient because they, like Mr. Jennings, "were to be paid millions of dollars for the value of their equity interests," and "[a]ccepting Mr. Jennings' premise means Mr. Taylor intentionally or with reckless disregard used a knowingly insecure computer system to communicate his own sensitive financial information when doing so could have just as easily resulted in the misdirection of funds due to him." ECF No. 13-1 at 14.

Whether the complaint adequately alleges a claim for gross negligence is a close question. Gross negligence is a higher bar than negligence, and as noted above requires that a defendant have either inflicted an injury intentionally (which Plaintiff does not allege) or that a defendant have been "so utterly indifferent to the rights of others that he acts as if such rights did not exist." *Stracke*, 465 Md. at 421 (quoting *Barbre*, 402 Md. at 187). It may turn out that the evidence will not support a theory that Mr. Burkindine and Mr. Taylor acted with gross negligence. But even at the summary judgment stage, whether a defendant has acted with gross negligence is ordinarily a question of fact. *Artis*, 100 Md. App. at 652. And here, the Court must not only accept as true all of Plaintiff's factual allegations but must also draw all reasonable inferences therefrom in Plaintiff's favor. *King*, 825 F.3d at 212. Here, the allegations are sufficient to allege a claim for gross negligence.

For these reasons, the motion to dismiss Count 4 will be granted in part and denied in part. It is denied with respect to the component of Count 4 that asserts a claim for gross negligence; otherwise Count 4 is dismissed.

## B.    Count 5 – Breach of oral contract regarding tax liability

Count 5 arises from Mr. Jennings' allegation that in 2021, when he "transferred a substantial portion of his equity in the company to Mr. Burkindine and Mr. Taylor," they "agreed they would pay any tax liability of Mr. Jennings' relating to the company." ECF No. 1 ¶¶ 202, 203. He alleges that he owed $600,000 in taxes as of the filing of the complaint, which may increase due to interest and penalties. *Id.* ¶ 208. Defendants describe the allegations as claiming the existence of an "oral" agreement to pay these tax liabilities. ECF No. 13-1 at 18. Mr. Jennings challenges this characterization, "believ[ing]

there exists written evidence of this agreement that he does not currently have access to absent discovery." ECF No. 18 at 22.

Mr. Burkindine and Mr. Taylor argue Count 5 should be dismissed because three sets of written agreements expressly preclude Mr. Jennings' contention that they agreed to be personally obligated to pay that tax liability. First, Mr. Burkindine and Mr. Taylor point to the gift letters pursuant to which Mr. Jennings transferred his equity interests in 2021. Those letters "provide[] that Mr. Jennings irrevocably gave, transferred, assigned, and delivered a percentage of his membership interest in Building to Messrs. Burkindine and Taylor for '$1.00 *and no other consideration*.'" ECF No. 13-1 at 17 (emphasis in Defendants' brief). Second, they point to the employment agreement they entered with Mr. Jennings after the 2021 equity transfer, in which Vetro agreed to pay Mr. Jennings a salary ($275,000) and in which the parties agreed that "This Agreement contains the entire agreement between the Parties relating to your employment hereunder by [Vetro] and supersedes all prior and contemporaneous negotiations, undertakings, and agreements, whether written or oral, between the Parties." ECF No. 13-8 at 4 (¶ 7(h)). Third, they point to the Vetro operating agreement itself, which expressly addresses quarterly distributions to its Class B members, to make "estimated tax payments attributable to the net profits" of the company. ECF No. 13-3 at 14−15 (§ 6.4). They contend that if they had agreed to pay the tax liability at issue in Count 5, any such obligation would have been set forth in the Vetro operating agreement, and that because it was not, Mr. Jennings' allegation that there was such an oral agreement, and that it was enforceable, is implausible. ECF No. 13-1 at 16−19. They also note that, under the operating agreement, Mr. Jennings' consent was required before a sale of Vetro's

assets, ECF No. 13-3 at 19 (§ 7.6E), and thus "if an agreement existed, Mr. Jennings had the right to enforce it before consenting to [Vetro's] sale." ECF No. 23 at 13.

In response to these points, Mr. Jennings argues that the Court should not consider these contracts because they "contradict the Complaint's allegations." ECF No. 18 at 21. He filed a Rule 56(d) declaration, in which in relevant part he states that there is "at least one email in which Defendants Burkindine and Taylor acknowledged the agreement to pay the tax liabilities at issue in this case," and other "[c]ompany documents" that he contends "likely also document partial performance of their obligation to pay the tax liability in 2022." ECF No. 18-1 ¶ 21.

The Court will grant Defendants' motion to dismiss Count 5. Each of the three contracts that Defendants point to are referred to in Plaintiff's complaint: the gift letters (ECF No. 1 ¶¶ 46–48), the employment/consulting agreement (*id.* ¶ 48), and the operating agreement (*id.* ¶¶ 47). Thus the Court may properly consider them without converting Defendants' motion to one for summary judgment. *See, e.g.*, *Okorie*, 617 F. Supp. 3d at 323 (at the pleadings stage, considering whether an exculpatory clause in a rental application precluded the claims because the complaint "specifically references the rental application process such that the Rental Application is fairly deemed to be integral to the complaint"). Those contracts foreclose Plaintiff's claim that Defendants Burkindine and Taylor owed Plaintiff a legal obligation to pay the alleged tax liability. *See, e.g.*, *Adloo*, 344 Md. at 259 ("It is well settled in this State, consistent with 'the public policy of freedom of contract,' exculpatory contractual clauses generally are valid") (quoting *Wolf v. Ford*, 335 Md. 525, 531 (1994)); *Jacobs v. Venali, Inc.*, 596 F. Supp. 2d 906, 912 (D. Md. 2009) (granting motion to dismiss because "plaintiffs' claims

against these individuals and corporations are barred by the express terms of [a] release").

Because the Court concludes that Count 5 does not state a claim on which relief can be granted for the reasons stated above, it need not reach Defendants' other argument that even if there was an oral agreement as alleged, "that agreement is barred by the statute of frauds." ECF No. 13-1 at 18.

### C.    Punitive damages claim

Finally, Defendants Burkindine and Taylor have moved to dismiss Plaintiff's punitive damages claim. Mr. Jennings alleges that he has adequately alleged facts that, if proven, would entitle him to punitive damages, specifically (1) that Defendants concealed from him that Vetro's email system had been hacked, ECF No. 1 ¶ 198, and (2) that Mr. Burkindine "assured Mr. Jennings that the funds had been wired to Mr. Jennings, but because the wire was for an international transaction, it would take several days before Mr. Jennings would receive the funds," *id.* ¶ 16. *See* ECF No. 18 at 23–24 (pointing to these allegations as the basis for his punitive damages claim).

"In Maryland, in order to recover punitive damages in any tort action . . . facts sufficient to show actual malice must be pleaded and proven by clear and convincing evidence." *MCB Woodberry Dev., LLC v. Council of Owners of Millrace Condo., Inc.*, 253 Md. App. 279, 309 (2021) (cleaned up). Plaintiff's allegations do not rise to the level of actual malice as required to sustain a claim for punitive damages. As stated above, it is a close question whether Plaintiff's allegations are sufficient to state a claim for gross negligence. The "actual malice" required for punitive damages is a higher standard. *See Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 463 (1992) ("[N]egligence alone, no

matter how gross, wanton, or outrageous, will not satisfy [the] standard [of actual malice].").

**V.    CONCLUSION**

For the reasons stated above, Count 4 will be dismissed in part (with prejudice), dismissing any claims of ordinary negligence but not claims of gross negligence, Count 5 will be dismissed (with prejudice), and Plaintiff's claim for punitive damages will be dismissed (without prejudice). The motions to dismiss will otherwise be denied. A separate order follows.

Date: August 15, 2025                              /s/

                                        Adam B. Abelson
                                        United States District Judge